UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

KIM LEONARD MOSBY,

                    Plaintiff,

-vs-                                                Case No.  5:03-cv-167-Oc-10GRJ

NINA IRENE RAILEY, and CITY OF
OCALA,

                    Defendants.
_____

# O R D E R

This case is before the Court for consideration of Defendant City of Ocala's Motion

for Summary Judgment (Doc. 122), to which the Plaintiff has responded (Doc. 127).[1]  The

motion is ripe for review and the Court concludes that it is due to be GRANTED.

## I. PROCEDURAL BACKGROUND

On May 23, 2003, the Plaintiff filed this civil rights action against Nina Irene Railey,

the City of Ocala, the State Attorney's Office, Sherri C. Harrell, and the Florida Department

of Law Enforcement (Doc. 1).  The Plaintiff's Second Amended Complaint added Morrey

Deen, the Ocala Police Department Chief of Police, and Henry Parrish, an Ocala Police

---

[1]       The Plaintiff's response to the summary judgment motion contains an exhibit with approximately 150 pages that was filed upside down in CM-ECF.  See Doc. 128, Parts 2-7.  To view the exhibit, the Court was required to print out all of the material, thus defeating the purpose of electronic filing.  When parties electronically file exhibits, they should use care and verify that their exhibits can be viewed by the Court.

Department Captain, as parties to this action (Doc. 31).  On summary judgment, the City

of Ocala is the only remaining party defending the case.[2]

On August 2, 2004, the Court granted in part the City of Ocala's Motion to Dismiss

(Doc. 79), thereby leaving the following claims before the Court:

(1) whether under 42 U.S.C. § 1983 the City of Ocala violated the Plaintiff's

Fourteenth Amendment right to procedural due process insofar as he was (a) not provided

notice or a hearing with respect to his suspension or termination, and (b) not provided a

hearing to clear his name with respect to the published statements in the local media as

to his suspension and termination;

(2) whether under 42 U.S.C. § 1983 the City of Ocala violated the Plaintiff's Fourth

Amendment rights because he was arrested without probable cause; and

(3) whether under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 the City of Ocala violated

the Plaintiff's right to equal protection insofar as he was suspended and terminated on the

basis of his race.[3]

On August 24, 2005, a pre-trial conference was conducted in this case pursuant to

prior notice.   During the conference, the Parties agreed that the Plaintiff's racial

discrimination claims are not supported by the evidence and can be dismissed by the

---

[2]     Nina Irene Railey defaulted. See Doc. 52. The Plaintiff voluntarily dismissed his suit against Sherri C. Harrell, the Florida Department of Law Enforcement, and the State Attorney's Office.  See Docs. 5, 28.  And the parties stipulated to the dismissal of the claims against Henry Parrish (Doc. 101) and Morrey Deen (Doc. 106).

[3]     See Doc. 70, Third Amended Complaint; Doc. 79, Order on Motion to Dismiss.

Court.  Accordingly, the Plaintiff's racial discrimination claims are dismissed.  The only remaining claims before the Court on summary judgment are the Plaintiff's procedural due process and unlawful arrest claims.

## II. STATEMENT OF FACTS

*A. Officer Mosby's Employment Status*

The Plaintiff, Kim Mosby, began his employment with the Ocala Police Department on August 10, 1998.[4]  According to the Deputy Chief of Police, "[a]t all times throughout his employment, up until his termination on July 12, 2000, [Officer Mosby] remained in a probationary status and as such, his employment was at will."[5]  In his deposition, the Chief of Police, Morrey Deen, testified that all police department employees were on probationary status for a twelve-month period.[6]  In addition, Chief Deen testified that even if the twelve-month probationary period has lapsed, an officer will remain on probationary status if he has not completed the Ocala Police Department Field Training Program.[7]  Therefore, based on the date he began his employment with the police department, Officer Mosby would be considered a probationary employee up until August 10, 1999.  Furthermore, it is undisputed that Officer Mosby never completed the Field Training Program, therefore,

---

[4]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 1.  In his deposition, Officer Mosby stated that his employment began in 1999, and then later he stated it began in 1998.  Doc. 112, Deposition of Kim Mosby, pg. 40, 164.

[5]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 1.

[6]     Doc. 128, Part 40, Deposition of Morrey Deen, pg. 16.

[7]     Id. at 19.

based on Chief Deen's testimony, Officer Mosby would have been a probationary employee his entire length of employment at the Ocala Police Department.[8]  However, Officer Mosby received a document from the City of Ocala reflecting that on February 10, 1999 he attained "Regular Employee status."[9]

There is an obvious issue of fact on this point, but it is not a "material" dispute foreclosing summary judgment because the Court will assume, infra, that Officer Mosby was a vested or regular full-time employee at all pertinent times.

*B. Criminal and Internal Investigations*

On May 17, 1999, about nine months after Officer Mosby began his employment with the Ocala Police Department, Nina Irene Railey filed a formal complaint with the Department against him.[10]  Ms. Railey reported that she first met Officer Mosby on April 22, 1999, when she had a panic attack and her counselor called the police.[11]  Ms. Railey claimed that afterward, on April 29, 1999, Officer Mosby returned to her home and offered

---

[8]      See Doc. 112, Deposition of Kim Mosby, pg. 64.

[9]      Doc. 128, Part 44, Regular Employment Status Card.

[10]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 2.

[11]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 2; see also Exh. A-1, Statement of Nina Railey given to the Ocala Police Department on May 19, 1999; Exh. A-5, Probable Cause Affidavit of Captain R.H. Parrish.

to protect her and keep her from being "Baker Acted" (involuntarily committed) if she would engage in sexual intercourse with him.[12]

In response to Ms. Railey's complaint, the Ocala Police Department commenced an investigation to determine whether Officer Mosby had engaged in the alleged criminal conduct.[13]  Ralph Henry Parrish, who was both a captain and internal affairs officer for the Ocala Police Department, conducted both the criminal and internal investigations involving Officer Mosby.[14]  Captain Parrish conducted the criminal investigation first, and during that investigation he did not notify Officer Mosby that he was under investigation.[15]

In her statement to the police, Ms. Railey described her encounters with Officer Mosby.  Ms. Railey claimed that Officer Mosby came to her home on two occasions in his silver car and while wearing "regular clothes."  During the visits, the two engaged in sexual intercourse allegedly against Ms. Railey's will because Officer Mosby had "saved [Ms. Railey] from being Baker Acted" and because she "needed to finish helping him, since he's

---

[12]     Id.

[13]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 2.

[14]     Doc. 120, Deposition of Ralph Henry Parrish, pg. 8, 18.   Captain Parrish recommended that he not be assigned to both investigations so that they could be conducted separately.   Id. at pg. 18-19.  Captain Parrish was concerned that there would be a conflict because an officer is compelled to answer questions during an internal affairs investigation, whereas in a criminal investigation, an officer has a constitutional right to remain silent.   Id. at 20. To alleviate this concern, Captain Parrish conducted the criminal investigation first and the internal affairs investigation second.   Id. at 21.

[15]     Id. at 21, 33.

helped [her]."[16]   Ms. Railey claimed that Officer Mosby came to her home on a third

occasion and told her to let him in, or he would call the police and tell them she was having

another panic attack.[17]   During this third visit, Officer Mosby used a massager on her.[18]

On May 19, 1999, Ms. Railey identified Officer Mosby in a photographic line-up.[19]

On May 25, 1999, Captain Parrish arranged for and taped a telephone conversation

between Ms. Railey and Officer Mosby.  The following exchange took place, which Officer

Mosby admits is accurate:[20]

> NR:[21] Huh, well I haven't heard from you in a while
> KM:[22] You haven't heard from me in a while?
> NR: No, and I didn't know if you had heard about what happened last Monday.
> KM: What happened?
> NR: Uh, about how they Baker Acted me?
> . . .
>
> KM: Did you tell them to call me?
> NR: No.
> KM: No, you didn't? When was it, last Monday?

---

[16]   Doc. 35, Exh. A-1, Statement of Nina Railey given to the Ocala Police Department on May 19, 1999. pg. 11-15.

[17]   Id. at 17.

[18]   Id. at 18.

[19]   Doc. 35, Exh. A-2, Photographic Line-up Record.

[20]   Doc. 112, Deposition of Kim Mosby, pg. 98.  Officer Mosby was actually given made up phone messages from Ms. Railey so that he would call her from the Ocala Police Department and so that his phone conversations could be recorded.

[21]   NR stands for Nina Railey.

[22]   KM stands for Kim Mosby.

6

NR: Yeah, I tried, I kept trying to, you know, tell them to call, but they said that you weren't working and all this, and I knew that you could get me out of it, cause you said you could.

KM: Right.

NR: And it was, I just didn't know what to do and I was really scared and I didn't know if you know, you had gotten mad at me, cause I wasn't here.

KM: No.

. . .

KM: Listen to me, Nina.  I can't uh, make them not Baler [sic] Act you, okay? I can only try to find out the circumstances and,

. . .

NR: Okay, I just didn't know if maybe I hadn't satisfied you with the sex or not and thought that maybe you had gotten mad. And I

KM: No, Nina, Nina, Nina, Nina, Nina, Nina, Nina, Nina, Nina, listen to me. Listen to me, okay?

NR: I'm just, I was just scared, I didn't know.

KM: Listen to me. Okay?  Are you listening?

NR: Yes, I just didn't know if I had satisfied you or not and I

KM: Nina.  Shhh.

NR: I'm sorry, please don't be mad at me.

KM: Nina, Nina, Nina, listen to me, okay?  Are you listening to me?

NR: Yes, you know I am.

KM: No, I'm not mad at you, I'm not mad at you.  Uh, what I'm trying to get you not to do is.  If you need help, okay, you can call, okay?  You can call. But I'm trying to get you not to call and harass the uh, dispatchers. . . [23]

Officer Mosby called Ms. Railey later the same day (on May 25th) and the following

conversation took place, in relevant part:

KM: Nina.  In a couple hours I will come by, if you want me to come by and sit down and talk with you?

NR: You know what I want.

KM: What do you want?

NR: Exactly what you promised.

---

[23]     Doc. 35, Exh. A-3, Transcript of Surveillance Tapes of Phone Conversations between Nina Railey and Kim Mosby, First Transcript.

KM: What did I promise?

NR: That if I did what you wanted.

KM: Nina.

NR: Which was have sex,

KM: No, Nina, listen to me, no, no, no.  Listen to me, okay?  I promised to take care of you, to make sure that you're safe, okay?  All right?  I will stop by there in a couple of hours.

NR: I want these cops to leave me alone, okay?  I can't take it any more and you know I can't.  You know how I get when I have my panic attacks.  And I can't take it any more.  This is what I'm trying to tell you.

KM: Okay.

. . .

NR: So you want me to make sure Chad's gone?[24]

KM: If that's what you want, yes.

. . .

NR: It depends on if we're going to talk or if we're going to have sex or what, because I don't want Chad here.

KM: Nina, Nina.

NR: what.

KM: Nina, slow down, slow down, slow down. Okay?

NR: I am.

KM: Listen, I will be over to talk to you.

NR: It's just I don't want to be in

KM: I will be over to talk to you,

NR: If we're having sex I don't want to be interrupted by Chad.

KM: Nina, I will be over to talk to you in a couple hours, okay?[25]

On the evening of May 25, 1999, two Ocala police detectives conducted video

surveillance of Officer Mosby arriving at Ms. Railey's home in his personal vehicle, which

---

[24]     Chad is Ms. Railey's son.

[25]     Doc. 35, Exh. A-3, Transcript of Surveillance Tapes of Phone Conversations between Nina Railey and Kim Mosby, Third Transcript.

was a silver or gray Nissan 300 ZX.[26]  Officer Mosby left shortly thereafter apparently because Ms. Railey was not at home.[27]

The following day, May 26, 1999, Captain Parrish interrogated Officer Mosby.[28] After the interrogation, Captain Parrish prepared a probable cause affidavit, and a warrant was issued for Officer Mosby's arrest by Circuit Judge Carven Angel the same day.[29]  The probable cause affidavit was in support of criminal charges against Officer Mosby for sexual battery, extortion, and official misconduct.[30]

In his probable cause affidavit, Captain Parrish stated that on May 15, 1999, the Ocala Police Department responded to a report by Ms. Railey that her home had been burglarized.[31]  The responding officers were suspicious of Ms. Railey's report because of her inconsistent statements, so they interviewed her again on May 17, 1999.  During the second interview, Ms. Railey revealed that Officer Mosby had coerced her to engage in sexual intercourse, and she made up the home invasion report to keep Officer Mosby from

---

[26]     Doc. 128, Exh. 1, Internal Affairs Report, Police Report Dated May 26, 1999, pg. 124.

[27]     Id.

[28]     Doc. 120, Deposition of Ralph Henry Parrish, pg. 66.

[29]     Id. at 67; Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Exh. A-5, Probable Cause Affidavit of Captain R.H. Parrish.

[30]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Exh. A-5, Probable Cause Affidavit of Captain R.H. Parrish.

[31]     Id.

coming to her home on the 17th.[32]  In his affidavit, Captain Parrish explained that Ms. Railey first met Officer Mosby of April 22, 1999, when she had a panic attack and her counselor called the police.[33]  According to his affidavit, on April 29, 1999, Officer Mosby returned to Ms. Railey's residence while driving his personal vehicle and while wearing civilian clothes. It was during that visit that Officer Mosby told Ms. Railey that he could keep her from being "Baker Acted" if she would have sex with him.[34]  Captain Parrish stated that he learned of Officer's Mosby's conduct through Ms. Railey's statement to the police, and her statement was corroborated by taped phone conversations between Officer Mosby and Ms. Railey, where Officer Mosby "acknowledged statements he had made previously to the victim with regard to being able to help the victim" and "acknowledged sexual activity" between the two.[35]  Additionally, Captain Parrish stated that surveillance tape showed Officer Mosby visiting Ms. Railey's home, when he denied visiting her home or having sex with her.[36]

On May 26, 1999, Chief of Police Morrey Deen suspended Officer Mosby's employment with the Ocala Police Department without pay due to his arrest for sexual

---

[32]    Id.

[33]    Id.

[34]    Id.

[35]    Id.

[36]    Id.

battery, extortion, and official misconduct.[37]   Although Chief Deen stated that Officer Mosby was suspended without pay because of his arrest, Officer Mosby was actually suspended before he was arrested.[38]   The letter notifying Officer Mosby of his suspension stated that he was suspended based on the Department Directive which requires officers to obey all laws and ordinances, and the authority created by the Department Directive stating that employees may be suspended when, in the judgment of the Chief of Police, the employees' work or misconduct so warrants.[39]

After Officer Mosby was suspended from his employment and arrested, he was advised of his Miranda rights and was interrogated by Captain Parrish for a second time because Officer Mosby wanted to know why he was being arrested.[40]

During the second interrogation, the following exchange took place in relevant part:

HP:[41] Okay, well, if you recall during the interview this morning, I asked you if you'd ever been to her house, while off-duty.
KM: Yes, sir.
HP: And you said no.  That you had never been to her house off-duty.  Was that in fact the truth or was that?
KM: To the best of my knowledge, yes sir, that was the truth.

---

[37]     Doc. 124, Part 2, Affidavit of Morrey Deen, pg. 2, 13; Doc. 128, Deposition of Morrey Deen, pg. 30.

[38]     In his deposition, Captain Parish explained that Officer Mosby was suspended first so that his badge and gun could be retrieved, and then he was arrested.  Doc. 120, Deposition of Ralph Henry Parrish, pg. 35.

[39]     Doc. 128, Part 33, Letter Dated May 26, 1999.

[40]     Doc. 120, Deposition of Ralph Henry Parrish, pg. 68-69.

[41]     HP stands for Henry Parrish.

HP: You've never been to her house?

KM: Off-duty? To the best of

HP: Off-duty.  In your personally owned vehicle, you've never been to her house?

KM: In my personal vehicle?

HP: I mean that's off-duty.

KM: To the best of my knowledge, uh, uh.

HP: Okay.  You also said, that you've never had sex with her.

KM: Yes, sir.

HP: Did you not say that?

KM: Yes, I said that.

HP: Okay, so basically, you told me that you never had sex with her and that you've never been to her house while off-duty and in plain clothes, in your personal vehicle.

KM: That's, that's what I stated.  Sir, to the best of my knowledge, yes, sir.[42]

The day after Officer Mosby was suspended without pay and arrested,  the Ocala Star Banner published a story regarding the allegations against Officer Mosby.[43]

On February 18, 2000, the Deputy Chief of Police and Captain Parrish received a forensic report from the Florida Department of Law Enforcement which confirmed that Officer Mosby's DNA was taken from an electric massager obtained from Ms. Railey's home.[44]  A police officer involved with the review board and charged with recommending a consequence for Officer Mosby's conduct stated that the DNA report was not clear, but he knew that Officer Mosby was a "contributor" to the DNA found on the massager.[45]  The

---

[42]      Doc. 35, Exh. A-4, Transcript Captain R.H. Parrish's Interview with Officer Mosby.

[43]      Doc. 128, Part 21, Ocala Star Banner News Article.

[44]      Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Exh. A-6, FDLE DNA Report; Doc. 120, Deposition of Ralph Henry Parrish, pg. 125.

[45]      Doc. 117. Deposition of Rodney Smith, pg. 18.

DNA report stated in relevant part: "The DNA profile from the sperm cell fraction of Exhibit 1 [the sample from the electric massager] is a mixture of DNA from two or more sources. Both Kim Mosby and Nina Railey are included as potential contributors to the DNA mixture."[46]

On February 24, 2000, the Ocala Police Department commenced an internal investigation to determine whether Officer Mosby had violated Ocala Police Department Departmental Directives.[47]  A report of the investigation concluded that several violations had occurred and recommended that disciplinary action be taken against Officer Mosby.[48]

*C. Pre-termination Hearings*

On June 13, 2000, Officer Mosby was advised that he has been charged with violations of the Ocala Police Department's Rules of Conduct and he was also advised of his right to convene a Complaint Review Board "for the purpose of making recommendation to the Chief of Police concerning any discipline to be administered."[49] Officer Mosby exercised his right and the Complaint Review Board convened on June 30,

---

[46]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Exh. A-6, FDLE DNA Report.

[47]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Doc. 120, Deposition of Ralph Henry Parrish, pg. 106.

[48]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Doc. 120, Deposition of Ralph Henry Parrish, pg. 111-112.

[49]     Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Exh. A-7, Letter from Morrey Deen, Chief of Police, to Officer Mosby, dated June 13, 2000.  Officer Mosby allegedly violated the rule to obey all laws and ordinances, the rule against making false reports, and the rule against intimidating any person for personal reasons under the color of authority.

2000.[50]   The procedure established for governing the composition of the Board was designed to ensure impartiality.  Officer Mosby selected two members of the Complaint Review Board, the Chief of Police selected the Chair of the Board and one other police officer to serve on the Board, and those four members chose the fifth member of the Board.[51]

According to the Complaint Review Board's Report, no witnesses testified on Officer Mosby's behalf, and five other witnesses testified.[52]   The internal affairs investigator, Captain Parrish, presented witness testimony and physical evidence to prove that Officer Mosby engaged in unbecoming conduct and made false statements, and Officer Mosby was given the opportunity to "question or re-question all witnesses" and "present witnesses on [his] behalf."[53]   In fact, Officer Mosby exercised his right to cross-examine witnesses. Officer Mosby nevertheless felt that he was treated unfairly during the hearing because he was not given a chance to present evidence.[54]  But the hearing transcript clearly shows that the chairperson told Officer Mosby that he could present witnesses on his behalf, and

---

[50]      Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Exh. A-7, Letter from Officer Mosby, dated June 20, 2000; Report of the Complaint Review Board; Doc. 124, Part 4, Complaint Review Board June 30, 2000 Meeting Transcript.

[51]      Doc. 112, Deposition of Kim Mosby, pg. 146-147; Doc. 120, Deposition of Ralph Henry Parrish, pg. 120; Doc. 117, Deposition of Rodney Smith, pg. 10.

[52]      Doc. 35, Exh. A-7, Report of the Complaint Review Board.

[53]      Doc. 124, Part 4, Complaint Review Board June 30, 2000 Meeting Transcript, pg. 3-4, 10, 23.

[54]      Doc. 112, Deposition of Kim Mosby, pg. 151.

Officer Mosby acknowledged that he had this right.[55]  Officer Mosby stated that he did not present witness testimony because there was an ongoing criminal investigation.[56]

During the Complaint Review Board hearing, Captain Parrish generally presented evidence that was mentioned in his probable cause affidavit, including the testimony of officers who took Ms. Railey's statement, audio tapes of recorded phone conversations between Ms. Railey and Officer Mosby, audio tapes of the recorded interviews between Captain Parrish and Officer Mosby, and the surveillance video of Officer Mosby at Ms. Railey's home.  In addition, during the hearing, some testimony focused on the credibility of Ms. Railey's accusations.  One police officer stated that he "was under the impression that for, for some reason [Ms. Railey] fabricates crime scenes and then calls us" and that he would characterize her mental condition as "paranoid."[57]  And another police officer stated that Ms. Railey was sometimes "perfectly normal" and other times "she's just so far out there that it's very hard to deal with her."  She "definitely ha[d] some mental problems" and was "in and out of touch with reality."[58]

In fact, the record in this case reveals that Ms. Railey had dozens of contacts with the Ocala Police Department prior to her complaint about Officer Mosby, which apparently

---

[55]     Id. at 153.

[56]     Id. at 165.

[57]     Doc. 124, Part 4, Complaint Review Board June 30, 2000 Meeting Transcript, pg. 9, 13.

[58]     Id. at  26.

was not brought to the Board's attention.[59]  In particular, a few weeks before Ms. Railey

reported Officer Mosby's alleged conduct to the police, Ms. Railey had reported to the

police that she had been robbed by two men behind Montgomery Wards.[60]  As a result of

the report, the police interviewed a friend of Ms. Railey's who stated that Ms. Railey told

her that she was raped by two men near the dumpster at Montgomery Wards.[61]  In

addition, about two weeks after Ms. Railey reported Officer Mosby's conduct to the police,

Ms. Railey also reported to the police that a man who had read about her allegations

against Officer Mosby in the newspaper raped her in her home.[62]

The Complaint Review Board found that Officer Mosby "did use conduct that brought

disrepute to the Department and reflects discredit upon persons of the Department . . .

[Officer] Mosby [also] caused or made an oral false report."[63]  Accordingly, "[b]ased on the

severity of the findings involving Ocala Police Department Directives 11.14.1.70 Rules of

---

[59]     See Doc. 128, Parts 16, 17, 22-29.  Over about a ten year period, the Ocala Police Department had occasion to come into contact with Ms. Railey for multiple reasons, including reports of an intruder in her home, burglary, battery, trespass, and a barking dog.

[60]     Doc. 128, Part 15, May 4, 1999 Police Report.

[61]     Id. It actually became evident during the board review hearing that, Officer Mosby was called out to Mr. Railey's home to respond to Ms. Railey's complaint on May 4, 1999.  Officer Mosby was off-duty at that time – meaning in plain clothes and in his private vehicle.  Ms. Railey had told the dispatcher that she only wanted to talk to Officer Mosby.  Doc. 124, Part 4, Complaint Review Board June 30, 2000 Meeting Transcript, pg.  34-35.

[62]     Doc. 128, Part 26, June 1, 1999 Police Report.

[63]     Doc. 35, Exh. A-7, Report of the Complaint Review Board.

Conduct and Unbecoming Conduct and 11.14.1.749(14)" (the false report rule), the Board recommended that Officer Mosby be terminated.[64]

On July 7, 2000, Officer Mosby was notified of his right to a pre-termination hearing with Chief of Police Morrey Deen.[65]  In response, Officer Mosby notified Chief Deen that he intended to exercise his right to the pre-termination hearing.[66]

Officer Mosby testified that before his pre-termination meeting with Chief Deen on July 12, 2000, he learned of his termination from a local news crew who had just taken a statement from Chief Deen.[67]  Shortly after his meeting with Chief Deen and after he had learned from a local news channel that he had been terminated, Officer Mosby received a letter notifying him of his immediate termination of his employment with the Ocala Police Department for unbecoming conduct of a police officer and for making a false report.[68]

---

[64]   Id.

[65]   Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Exh. A-7, Letter from Morrey Deen to Officer Mosby, dated July 7, 2000.

[66]   Doc. 35, Affidavit of Kenneth G. Graham, pg. 3; Exh. A-7, Letter from Officer Mosby to Morrey Deen, dated July 9, 2000.

[67]   Doc. 59, Affidavit of Kim Mosby, pg. 8.

[68]   Id.; Doc. 35, Exh. A-7, Letter from Morrey Dean to Officer Mosby, dated July 12, 2000.

*D. Officer Mosby's Explanation of the Events*

Officer Mosby confirmed that the first time he met Ms. Railey was as a police officer on a "well-being check."[69]  Ms. Railey appeared to be having some mental problems and she was transported to the hospital.  Officer Mosby rode with Ms. Railey in the ambulance and tried to calm her down.[70]  While at the hospital, Officer Mosby spoke to Ms. Railey for about thirty minutes to gain her trust.[71]  The day after this incident, Officer Mosby returned to Ms. Railey's house with his training officer to return her keys and driver's license, which were taken from her during the incident.[72]  The officers gave her belongings to Ms. Railey's eight-year-old son and did not have any contact with Ms. Railey.[73]

Officer Mosby stated that the next time he had contact with Ms. Railey was when he was off-duty and the police department instructed him to go to talk to Ms. Railey because she had barricaded herself in her house with a gun and he was the only person she would

---

[69]     Doc. 112, Deposition of Kim Mosby, pg. 76.

[70]     Id. at 84.

[71]     Id. at 77-79.

[72]     Id. at 81, 86. This fact is disputed.  Ms. Railey claims the first sexual assault occurred when Officer Mosby returned her license on April 29, 1999.  Officer Hancock, the police officer with whom Officer Mosby was working with the day the two went to Ms. Railey's on a well-being check, only remembered returning Ms. Railey's keys to her and thought the license was left with the paramedics who treated Ms. Railey.  Doc. 128, Part 30, Captain Parrish's Interview with Officer Hancock, pg. 4-5.

[73]     Doc. 112, Deposition of Kim Mosby, pg. 88, 90.

talk to.[74]  Other uniformed officers were at Ms. Railey's house when Officer Mosby arrived

in his private vehicle and civilian clothes.[75]  During that visit, Officer Mosby was able to get

Ms. Railey to come out of her house and the other officers grabbed her.[76]  Ms. Railey

claimed that two or three guys had tried to rape her behind Montgomery Ward, and she

fought them off and ran away.[77]  Officer Mosby claimed that this rape incident was the only

time he was in Ms. Railey's home and was the last time he had contact with Ms. Railey.[78]

Officer Mosby testified that he called Ms. Railey approximately five times, three of

which were recorded by the police department.[79]  Officer Mosby stated that during the

recorded telephone conversations, he was told by Ocala Police Officers to call Ms. Railey

and find out what her problem was.[80]  Officer Mosby was told that Ms. Railey had been

"harassing the dispatchers, saying she needs to talk to you."[81]  In explaining why he did not

confront Ms. Railey when she was talking about having sex with him on the phone, Officer

---

[74]  Id. at 86, 88, 91.

[75]  Id. at 92.

[76]  Id. at 92-93.

[77]  Id. at 94.

[78]  Id. at 96-97.

[79]  Id. at 95.

[80]  Id. at 102.

[81]  Id. at 104.

Mosby stated that he just wanted to "appease her, calm her down."[82]  During the phone conversations, Officer Mosby told Ms. Railey he would stop by her house and talk to her. He stated that he went to her house in the evening in his personal vehicle and civilian clothes.[83]  This visit was caught on a surveillance video.[84]

Officer Mosby stated that during the first interrogation by Captain Parrish he believed his right to be informed of the charges against him under the Police Bill of Rights was violated.[85]  Officer Mosby admitted that he made a false statement and it was fair for Captain Parrish to conclude that he made a false statement during the second interrogation, when Captain Parrish asked Officer Mosby if he had ever been to Ms. Railey's home off-duty and said that he had not.[86]

## III. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In Celotex Corp. v. Catrett, the Supreme Court recognized that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and

---

[82]   Id. at 117.

[83]   Id. at 108.

[84]   Id.

[85]   Id. at 126-127.

[86]   Id. at 136-137.

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[87]   The moving party bears the initial burden of establishing the nonexistence of a triable fact issue.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."[88]   The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.[89]

## IV. DISCUSSION

*A. Procedural Due Process Claims*

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"[90] The Plaintiff raises procedural due process claims relating to both his property interest in his employment and his liberty interests in his reputation.  The Court will therefore address each claim in turn.

------------------------------------------------------------

[87]     477 U.S. 317, 322 (1986).

[88]     Rollins v. Techsouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).

[89]     Celotex, 477 U.S. at 324.

[90]     Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)).

*1. Property Interest*

The Due Process Clause requires "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."[91]  In particular, the Supreme Court has held that a "'tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" prior to an employee's termination.[92]  In other words, an employee is entitled to "some kind" of pre-termination hearing, which includes notice and an opportunity to be heard.[93]

The Defendant contends that at the time of his suspension and termination the Plaintiff was a probationary, or at-will, employee and, therefore, lacked any property interest in his continued employment with the City.[94]  The Defendant has provided evidence that the Plaintiff was an at-will employee, however the Plaintiff has provided conflicting evidence supporting his allegation that he was a permanent employee.[95]  Accordingly, the

---

[91]    Id. (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971)).

[92]    Id. at 546.

[93]    Id. at 542; Harrison v. Wille, 132 F.3d 679, 684 (11th Cir. 1998).  It should be noted that neither the personnel policies of the Ocala Police Department nor the state law of Florida determines what process was due to the Plaintiff – federal constitutional standards provide for what process the Plaintiff was due.  See Bailey v. Bd. of County Commissioners of Alachua County, 956 F.2d 1112, 1122  (11th Cir. 1992).

[94]    See Ross v. Clayton County, 173 F.3d 1305, 1308 (11th Cir. 1999) ("Typically, probationary employees are thought to lack property interests in their employment because they are 'at will' employees without a legitimate claim of entitlement to continued employment.").

[95]    See Doc. 128, Part 44, Regular Employment Status Card; Part 37, Ocala Police
(continued...)

Court will assume that the Plaintiff had a property interest in his continued employment with the Ocala Police Department and analyze whether the undisputed material facts support a finding that the Plaintiff was afforded the process he was due – namely, notice and an opportunity to be heard.

"Notice was sufficient if it notified Plaintiff of the charges and was timely, whether oral or written."  In this case, the Plaintiff was notified by letter from the Chief of Police that he was suspended without pay because of his arrest for sexual battery, extortion, and official misconduct the same day he was suspended.  Additionally, the Plaintiff was notified by a another letter from the Chief of Police about two weeks prior to his Complaint Review Board hearing of the charges against him and his right to a hearing.  These notices sufficiently notified the Plaintiff of the charges against him – specifically, that he was facing discipline for allegedly raping Nina Railey and lying during the investigation – and the notices were timely.

The Plaintiff had several opportunities to be heard.  At the Complaint Review Board hearing, the Plaintiff was given the opportunity to make a statement, present evidence, and cross-examine witnesses in front of a neutral review board made up of the Plaintiff's colleagues.  Because the Plaintiff elected not to testify during the hearing so that he did not incriminate himself in the ongoing criminal investigation concerning the same charges does

---

[95](...continued)
Departmental Directives ("The Chief of Police may suspend a probationary or permanent employee with or without pay, for cause, upon approval of the Mayor.").

not negate the fact that the Plaintiff had an opportunity to be heard.[96]  In addition to the Complaint Review Board proceedings, the Plaintiff had an opportunity to meet with Chief Deen prior to his termination and present any reasons why he should not be terminated. These hearings satisfy the requirement that the Plaintiff be given an opportunity to be heard prior to his termination.

The Plaintiff received all the process he was due under the Fourteenth Amendment, including notice and an opportunity to be heard, prior to the date of his termination; however, the process the Plaintiff was due prior to his suspension without pay must also be addressed.

A pre-deprivation hearing is not always required before a public employer takes action against an employee.[97]  "[T]he necessity of quick action by the State or the impracticality of providing any meaningful pre[-]deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process."[98]

In applying this flexible legal standard regarding pre-deprivation due process to the facts of this case, the Court concludes that the Plaintiff has not established that it was

---

[96]     See Harrison, 132 F.3d at 684.

[97]     Bailey, 956 F.2d at 1123.

[98]     Id. (quoting Parratt v. Taylor, 451 U.S. 527, 539-40 (1981)) (internal quotations omitted).

unreasonable for the Defendant to forego a hearing prior to the Plaintiff's suspension without pay.  As an officer in training with the Ocala Police Department, the Plaintiff had been given significant authority, and the Defendant could reasonably have believed due to the severity of the charges and the fact that probable cause existed to support those charges, that the Plaintiff posed a threat to the public's confidence in the integrity of its police officers which necessitated quick action and caused a pre-deprivation hearing to become impracticable.  Furthermore, it was reasonable for the Defendant to believe that the post-deprivation remedies – in this case, the Complaint Review Board hearing and pre-termination hearing – were adequate.[99]

*2. Liberty Interest*

To prove that the Plaintiff was deprived of a liberty interest without due process of law, he must prove: "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing."[100]  The Eleventh Circuit has held that a "name clearing hearing" need not take place prior to an employee's termination or prior to the publication of the information adverse to the employee's interests – a post-termination hearing is a sufficient remedy.[101]  During the name clearing hearing,

---

[99]     Id. at 1124.

[100]    Buxton v. City of Plant City, 871 F.2d 1037, 1042-43 (11th Cir. 1989).

[101]    Id. at 1046.

25

the Plaintiff must have the opportunity "to support his allegations by argument however brief, and, if need be, by proof, however informal."[102]

As discussed previously, the Plaintiff was afforded notice and a hearing in both June and July of 2000, approximately one year after the allegedly false article about the Plaintiff was published in the Ocala Star Banner about the Plaintiff's suspension and near the time a news story was published by a local television station about the Plaintiff's termination. These hearings were sufficient for the Plaintiff to clear his name, accordingly summary judgment with respect to this claim is due to be granted.[103]

## B. Unlawful Arrest

Under the Fourth Amendment, individuals have the right not to be arrested without probable cause.[104]  Violation of this right may give rise to a claim under § 1983; however, the existence of probable cause is an absolute bar to a § 1983 claim for unlawful arrest.[105] Probable cause to arrest exists "if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a

---

[102]   Campbell v. Pierce County, Ga., 741 F.2d 1342, 1345 (11th Cir.1984) (citations omitted).

[103]   See Harrison, 132 F.3d at 683 n. 9 (holding that "[b]ecause this opportunity [for a name clearing hearing] is not as strict as the process required before one can be deprived of a property interest, due process was satisfied by the same opportunities provided for notice and hearing for the termination itself -- the predisciplinary conferences and subsequent Review Board Hearing.").

[104]   Von Stein v. Brescher, 904 F.2d 572, 578 (11th Cir. 1990).

[105]   Bailey, 956 F.2d at 1121 n. 10.

prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[106]  In other words, "we must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants *could* have believed that probable cause existed to arrest . . ."[107]

When the Plaintiff was arrested, the following evidence supported Captain Parrish's belief that the Plaintiff had coerced Ms. Railey into engaging in sexual intercourse with him to avoid being involuntarily committed: (1) Ms. Railey's detailed statement of the offense; (2) identification of the Plaintiff in a photographic line-up by Ms. Railey; (3) taped telephone conversations between Ms. Railey and the Plaintiff where the Plaintiff neither admitted nor denied having sex with Ms. Railey when the topic of sex was brought up by Ms. Railey; (4) two taped interviews with the Plaintiff where he gave inconsistent and false statements; (5) eye witness accounts of the Plaintiff visiting Ms. Railey's home while he was off-duty; and (6) surveillance video of the Plaintiff visiting Ms. Railey's home.

The Plaintiff's explanation of his actions and the evidence failed to create a substantial conflict in what Captain Parrish knew at the time of the Plaintiff's arrest, therefore Captain Parrish's reasons for finding probable cause to arrest were not

---

[106]    Von Stein, 904 F.2d at 578.  In Von Stein, the Eleventh Circuit noted that "'probable cause' defines a radically different standard than 'beyond a reasonable doubt,' and while an arrest must stand on more than suspicion, the arresting officer need not have in hand evidence sufficient to obtain a conviction."  Id. at 578 n. 9.

[107]    Id. at 579.

undermined.[108]  For instance, the Plaintiff testified that he did not confront Ms. Railey when she suggested that they had a sexual relationship on the telephone because he thought she was mentally unstable and just wanted to calm her down.  While this may provide an explanation for how the Plaintiff handled the phone call with Ms. Railey, it does not undermine the fact that a reasonable person could conclude that if the Plaintiff did not have sex with Ms. Railey, he would have confronted her about her allegations.  In addition, while the Plaintiff may be able to attack the credibility of Ms. Railey's statements due to her mental instability and the numerous contacts she previously had with the Ocala Police Department, the remaining reasonably trustworthy evidence corroborates Ms. Railey's allegations to the point that "a prudent person [would] believe, under the circumstances shown" that the Plaintiff had committed the offenses alleged.[109]  Finally, the fact that the Plaintiff was ultimately acquitted of the offense for which he was arrested does not mean that his arrest was not based upon arguable probable cause.[110]

*C. Intentional Infliction of Emotional Distress Claim Against Nina Irene Railey*

In his Third Amended Complaint, the Plaintiff claims that Nina Irene Railey is liable for intentional infliction of emotional distress because she made false criminal allegations against the Plaintiff.  In particular, the Plaintiff claims that Ms. Railey falsely claimed that

---

[108]     See Bailey, 956 F.2d at 1120.

[109]     It should also be noted that there is no evidence that Captain Parrish was aware of Ms. Railey's multiple contacts at the time of the Plaintiff's arrest, thereby further supporting a finding of probable cause.

[110]     See Pickens v. Hollowell, 59 F.3d 1203, 1208 (11th Cir. 1995).

the Plaintiff had forced her into a sexual relationship with him by threatening her with involuntary incarceration.[111]  Ms. Railey has defaulted with respect to this claim, therefore the Plaintiff's well-pleaded allegations with respect to this claim are deemed admitted.[112] Accordingly, it is deemed  true that Ms. Railey falsely reported that the Plaintiff had forced her into a sexual relationship with him by threatening her with involuntary incarceration. Nevertheless, the Court concludes as a matter of law that the Plaintiff's claim against Ms. Railey is without merit.  Even if Ms. Railey's allegations against the Plaintiff were false, the Plaintiff himself admitted that Ms. Railey was "crazy."[113]  In addition, rather than maliciously and vigorously pursuing these false claims against the Plaintiff, the Plaintiff has presented evidence that at one point Ms. Railey actually tried to have the charges dropped against the Plaintiff.[114]  These facts, taken together with the admitted facts in the Plaintiff's Complaint, do not rise to the level of "conduct that goes beyond all bounds of decency and

---

[111]    See Doc. 70, Third Amended Complaint, Count VII, pg. 3-4, 21-22.

[112]    See Nishmatsu Const. Co., Ltd. v. Houston Nat. Bank, 515 F.2d 1200, 1206 (5th Cir. 1975).

[113]    Doc. 112, Deposition of Kim Mosby, pg. 106.

[114]    Doc. 128, Part 20, Captain Parrish's September 8, 1999 Narrative Supplement.  In the Narrative, Captain Parrish stated that he met with Ms. Railey who stated that she did not wish to pursue her case based on her attorney's advice.  Apparently Ms. Railey feared she would be arrested for lying.

is regarded as atrocious and utterly intolerable in a civilized society."[115]   Accordingly, the

Plaintiff's claim against Nina Irene Railey is due to be dismissed.

## V. CONCLUSION

Accordingly, upon due consideration, it is ordered that:

(1) the Plaintiff's racial discrimination claims are DISMISSED pursuant to agreement

by the Parties at the pre-trial conference held in this case on August 24, 2005;

(2) the Defendant's Motion for Summary Judgment (Doc. 122) is GRANTED with

respect to the Plaintiff's remaining claims;

(3) the Plaintiff's claim against Defendant Nina Irene Railey is DISMISSED; and

(4) the Clerk is directed to enter judgment accordingly, terminate any pending

motions, and close the file in this matter.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 1st day of September, 2005.


_____

**UNITED STATES DISTRICT JUDGE**


Copies to:   Counsel of Record

---

[115]     See Scelta v. Delicatessen Support Services, Inc., 57 F. Supp. 2d 1327, 1357 (M.D. Fla. 1999) (citing Metro. Life Ins. Co. v. McCarson, 467 So.2d 277 (Fla. 1985)).